AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original  ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

5/22/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ TV _____ DEPTUTY

**FILED**
CLERK, U.S. DISTRICT COURT

05/22/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ IV _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America<br><br>v.<br><br>Lijuan Chen,<br>    aka "Angela Chen,"<br><br>Defendant | Case No.  2:23-mj-02644 |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

### Count One

### [18 U.S.C. § 371]

Beginning no late than on or about August 2022, and continuing until at least on or about May 16, 2023, in the Central District of California, and elsewhere, defendant did unlawfully, voluntarily, intentionally, and knowingly conspire and agree together with others to defraud the United States by impeding and impairing the lawful Government functions of the United States Postal Service, an agency of the United States, in the ascertainment and collection of postal revenues by deceitful and dishonest means, namely, the production and usage of counterfeit postage meter stamps, in violation of Title 18, United States Code, Section 371.

### Count Two

### [18 U.S.C. §§ 501, 2(a)]

On or about May 16, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant knowingly made, printed, and used, and caused to be made, printed, and used, forged and

AUSA:   James C. Hughes (#2579)

counterfeit postage meter stamps, namely, counterfeit postage meter stamps allegedly attributable to postage meter number 071S00894672, in violation of Title 18, United States Code, Section 501.

This criminal complaint is based on these facts:

      *Please see attached affidavit.*

      ☒ Continued on the attached sheet.

 

                                                   */S/ Mark White*
                                                   *Complainant's signature*

                                     Mark White, Postal Inspector USPIS
                                                 *Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:        May 22, 2023                       *Patricia Donahue*
                                                   *Judge's signature*

City and state:    Los Angeles, California          Hon. Patricia Donahue, U.S. Magistrate Judge
                                                   *Printed name and title*

AUSA:    James C. Hughes (#2579)

**AFFIDAVIT**

I, Mark White, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Postal Inspector ("PI") with the United States Postal Inspection Service ("USPIS") and have been so employed since August 2017.  I am currently assigned to the Revenue Investigation Fraud Team ("RI") located in Long Beach, California, which is responsible for investigating fraud against the United States Postal Service ("USPS" or "Postal Service").  Prior to my RI assignment, I was assigned to the Long Beach mail theft team.

2.   During my employment as a PI, I have participated in investigations related to financial and postal-related crimes such as bank fraud, robbery, mail theft, and postal-money-order and revenue fraud.  My investigations of these crimes have included bank and telephone records analysis, electronic and physical surveillance, search warrants, arrests, reviewing evidence from digital devices, and witness and suspect interviews.  I am familiar with the rules and regulations governing the USPS, including those pertaining to the acceptance, classification, sorting and delivery of mail; the methods used to commit fraud against the USPS; and the documents and other records that frequently evidence such fraud.  I have participated in or conducted recent criminal investigations concerning schemes to defraud the USPS of the lawful payment of postage.

3.    From 2011 to 2017, I was a Special Agent with the United States Secret Service ("Secret Service") in Santa Ana, California.  As a Secret Service Special Agent, my duties included investigating violations of federal law, including fraud and related activity in connection with the fraudulent use of access devices, bank fraud, wire fraud, counterfeit United States currency, and identity theft.

4.    During my tenure as a federal agent, I completed a ten-week Criminal Investigation Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, as well as a seventeen-week training program at the United States Secret Service James J. Rowley Training Center in Beltsville, Maryland. At these institutions, my training included, among other things, techniques for investigating and combating counterfeiting, wire fraud, bank fraud, and access-device fraud.

5.    I received my bachelor's degree from Florida State University and my master's degree from American Military University.

## II.  **PURPOSE OF AFFIDAVIT**

6.    This affidavit is made in support of a criminal complaint against, and arrest warrant for, LIJUAN CHEN, also known as "Angela Chen" ("CHEN"), for violations of 18 U.S.C. § 371 (Conspiracy to Defraud the United States) and 18 U.S.C. § 501 (Possession and Use of Counterfeit Postage).  This affidavit is also made in support of search warrants to search the following person and premises:

a.   16285 Gale Avenue, City of Industry, California, 91745 ("The SUBJECT PREMISES") as described more fully in Attachment A-1;

b.   The person of LIJUAN CHEN ("CHEN"), as described more fully in Attachment A-2.

The requested search warrants seek authorization to seize evidence, contraband, fruits, and instrumentalities of criminal violations of Title 18, United States Code, Sections 371 (Conspiracy to Defraud the United States) and 501 (Possession and Use of Counterfeit Postage) ("the SUBJECT OFFENSES"), as described more fully in Attachment B.   Attachments A-1, A-2, and B are incorporated herein by reference.

7.   The information set forth in this affidavit is based upon my participation in the investigation, encompassing my personal knowledge, observations, and training and experience, as well as information obtained through my review of evidence, investigative reports, interviews, surveillance materials, and information provided by other experienced participating Postal Inspectors, Special Agents, Officers, Analysts, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

3

### III. <u>**SUMMARY OF PROBABLE CAUSE**</u>

8.    The USPIS, in coordination with Internal Revenue
Service: Criminal Investigation ("IRS:CI") is investigating CHEN
for a counterfeit postage fraud scheme occurring within the
Central District of California.  The evidence obtained in the
investigation shows that CHEN is operating a business which
provides shipping and postage services to businesses, including
e-commerce vendors operating out of China, that seek discounted
USPS rates for mailing their products within the United States.
Multiple examinations conducted by USPS and USPIS staff have
revealed that the vast majority of the postage used by CHEN and
her business to ship goods within the United States is
counterfeit.  CHEN and her employees are believed to be
responsible for the attempted introduction of millions of
parcels bearing counterfeit postage into the USPS mail stream.

9.    CHEN's scheme appears to be a continuation of a
similar scheme by CHEN'S husband, Chuanhua "Hugh" Hu, which was
was previously investigated by USPIS.  Hu's left the United
States and travelled to China in 2019.

10.   Based on witness testimony and multiple surveillance
operations, as described below, I have identified the SUBJECT
PREMISES as a warehouse used by CHEN and her employees to
receive, process, and ship mail parcels containing counterfeit
postage.  Most recently, on May 16, 2023, I conducted
surveillance at the SUBJECT PREMISES and saw a delivery truck
leave the loading area of the SUBJECT PREMISES and travel to a

USPS facility, where it unloaded twelve large cardboard boxes full of parcels containing counterfeit postage.

## IV.   STATEMENT OF PROBABLE CAUSE

11.   The information set forth below is based on my training and experience as a former Secret Service Agent and Postal Inspector, as well as conversations with other Special Agents, Officers, USPS employees, witnesses, and USPIS Revenue Fraud Analysts ("RFA"), who are knowledgeable about USPS revenue and revenue loss and tactics used by those who attempt to defraud the USPS of revenue, including from USPS postage.

12.   The information set forth below is also based on my own observations while investigating this case, and my conversations with, and review of reports (including surveillance), video recordings, audio recordings, and photographs created or prepared by other Postal Inspectors, officers, Special Agents, and analysts involved in the investigation of this case.

### A.   THE USPS AND USPIS MISSION

13.   The USPS is an agency of the executive branch of the U.S. federal government responsible for providing postal service. It is one of the few government agencies explicitly authorized by the U.S. Constitution.

14.   The USPIS mission is to support and protect the USPS; enforce the laws that defend the nation's mail system from illegal or dangerous use; and ensure public trust in the mail.

5

B.  **USPS POSTAGE CRITERIA**

15.  The USPS offers many postal services, including the delivery of parcels.  All mailable articles shipped within the U.S. must comply with established mailing standards published in the USPS Domestic Mail Manual, including standards for weight, minimum/maximum dimensions, acceptable containers, proper sealing/closing, markings, and restrictions on items such as hazardous materials.

16.  Moreover, all mail pieces must bear appropriate valid postage.  The mailer is responsible for proper payment of postage and all mail must be fully prepaid at the time of the mailing.  Postage payment is shown in the form of stamps, stamped stationary, precanceled stamps, postage meter imprints and PC postage[1] products or permit imprint (Indicia), as well as via shipping label(s) purchased online and printed by the customer on standard paper (e.g., Click-N-Ship).

a.  A postage evidencing system is a device or system of components a customer uses to print indicia such as Information-Based Indicia[2]("IBI") or Intelligent Mail Indicia

---

[1] PC Postage is postage that consumers are able to print at home using devices and systems provided by vendors licensed to sell postage products over the internet.  PC Postage providers include Endicia, Stamps.com, EasyPost, and Pitney Bowes.

[2] Information-Based Indicia ("IBI") refers to a secure postage evidencing system to indicate electronic postage payment.

("IMI") to indicate postage payment. Customers print indicia directly on a mail piece or on a label that is affixed to a mail piece.

17.   The scheme at issue in the instant investigation involves the use of invalid PC Postage shipping labels.  PC Postage shipping labels are comprised of various components, each providing substantive information to the USPS regarding the mail item being shipped.  Some of the PC Postage components provide information in a format that can be read by the human eye ("human-readable format"), while other components, such as IBI, contain data-matrix barcodes that can only be processed and deciphered by a computer ("machine-readable format").  The human-readable and machine-readable components of PC Postage items contain some of the same categories of information (i.e. weight, tracking number, date of purchase).  A photograph of one of the counterfeit shipping labels identified in this investigation is provided below with the various components identified in red text:



18.   Based on my training and experience, and my
conversations with various USPS employees, I have learned that
the items identified in the image above provide the following
information:

        a.   Postage Information:  This section provides
information, in human-readable format, regarding the type of

postage product (e.g., First-Class Mail), the date the postage was purchased, the zip code from which the item is to be mailed, and the weight of the package.

b.   Intelligent Barcode:  This is a scannable barcode that provides information such as amount of postage, origin zip code, destination, mail class, weight, confirmation/tracking numbers, and a cryptographic signature;

c.   Meter Number:  This number identifies the specific postage meter used to print the postage.  A postage meter is a device or system of components a customer may use to print evidence that postage required for mailing has been paid. Postage printing machines or systems are typically leased by authorized providers for use in a customer's home or office.

d.   Shipper/Recipient Information:  This section provides information regarding both the party shipping the mail item, and the address and party to which the mail item is scheduled to be delivered.

e.   Tracking Number:  A sixty-five bar barcode used by the USPS to sort and track letters and packages. The human-readable numeric sequence below the barcode is comprised of specific portions identifying, among other items of information, the five-digit zip code for the item's destination, the Mailer Identifier[3] ("MID") for the originator of the barcode, and an individual serial number for the specific item of mail.

---

[3] The Mailer Identifier (MID) is a field within the barcode used to identify a specific mailer.  MIDs are assigned by the USPS to specific mail owners, agents, and postage service providers. Large postage service providers such as Endicia and

19.   When attempting to determine whether an item of PC
Postage is counterfeit, USPIS and USPS personnel will frequently
look to see if any of the unique identifiers on the postage are
either invalid or inconsistent with other information on the
shipping label.  For example, the postage shown in paragraph 17
above was identified as counterfeit based on the false meter
number listed in the upper right corner of the postage.  Based
on my training and experience and conversations with various
USPS Revenue Fraud Analysts, I know that meter numbers beginning
with the digits "07" were phased out of use in 2020.
Accordingly, no valid postage printed in 2023 should bear the
meter number listed on the shipping label shown above.

C.   <u>**INVESTIGATION BACKGROUND**</u>

20.   In late 2018 and early 2019, USPIS was notified by
USPS that a high volume of packages believed to bear counterfeit
postage were being introduced into the mail stream in the Los
Angeles area.  The counterfeit postage items were designed to
mimic postage pre-paid shipping labels purchased from internet-
based postage providers.  In addition, the return address used
on the majority of the mail ("HU mail") listed "Hugh Hu LC
Logistic, 17355 Railroad St, City of Industry, CA  91748" as the
sender.  The real property located at 17355 Railroad Street,
City of Industry, CA ("17355 Railroad St.") is a commercial
warehouse facility.  Per query of law enforcement databases and

_____

Stamps.com may have numerous MIDs assigned for their exclusive
use.

information gathered from interviews, Chuanhua "Hugh" Hu ("HU") is known to be CHEN's husband.

21. USPS staff were able to identify the abovementioned postage as counterfeit because the intelligent barcode data on the postage appeared to be intentionally damaged and obscured in order to render it unreadable by USPS sorting equipment. Based on my training and experience, and conversations with USPS Revenue Fraud Analysts, I know that individuals engaged in the production of counterfeit postage may use intelligent barcodes from previously shipped packages when fabricating counterfeit postage. Obscuring and altering intelligent barcode data is used in order to prevent USPS personnel from discovering that the payment indicia on the postage is either wholly fabricated or unrelated to the postage item being shipped.

22. On May 13, 2019, the USPIS mailed a certified letter to Hugh Hu LC Logistic advising them their postage was invalid. Between June 2019 and November 2019, USPIS conducted numerous mail reviews at postal facilities in the Los Angeles area and continued to observe thousands of packages bearing counterfeit postage being shipped by entities linked to HU and 17355 Railroad St.

23. Postal Inspectors interviewed HU on November 20, 2019, and again on November 21, 2019, regarding his use of counterfeit postage. The interviews took place at 17355 Railroad St. I have reviewed memoranda of interview prepared for both interviews. During these interviews, HU indicated the following:

        i.   HU claimed he was leasing the warehouse from
Yum Yum Donuts, and previously operated out of 15288 El Prado
Road, Chino.

        ii.  HU stated that he received parcels from
China, which he then consolidated and mailed, and that most of
the parcels HU received had labels and postage applied already
when he received them.

        iii. HU claimed that parties in China would
sometimes use the DHL package delivery service to send HU
postage and labels to apply to the parcels mailed from his
warehouse.

        iv.  HU claimed to use his own Endicia meter for
postage on his own packages (namely his clothing sales).  Based
on my training and experience, I know that Endicia is an
internet postage service provider that allows customers to print
USPS postage from their home or business.  Endicia is a wholly
owned subsidiary of Auctane.  Auctane also owns Stamps.com,
another internet-based mailing and shipping service.

        v.   HU admitted the post office had stopped
accepting his mailings in November, i.e., the month in which the
interview took place.

     24.  On November 20, 2019, USPIS received notice from
representatives of Stamps.com that Endicia Account # 832170 had
been the source of the production of several million "Zero
Postage Labels."  Based on my training and experience, I know
that a Zero Postage Label is a blank postage label which
contains a valid tracking ID with no postage paid.  Previously,

                          12

Stamps.com and Endicia allowed customers to print a "test" zero label. Based on my training and experience, and speaking with other Postal Inspectors and Revenue Fraud Analysts, I know that these Zero Postage Labels may be altered in order to appear to be valid postage-paid shipping labels. Individuals engaged in the production of counterfeit postage may alter or "photo-shop" Zero Postage Labels by adding in images of intelligent barcode data from previously shipped items.

25. Records provided by Stamps.com show that Endicia Account #832170 was held in the name of "LC Logistic/Hu, 17355 Railroad Street, City of Industry, CA 91748." According to Stamps.com, the account became active on March 14, 2012, and the contact name provided for the account was HU.

26. According to a search of law enforcement databases, HU departed Los Angeles International Airport (LAX) for Beijing, China, on November 23, 2019 – two days after the interview by Postal Inspectors described above. According to additional flight records checks and local surveillance, HU has not returned to the U.S. since then.

27. Per information provided to USPIS by USPS personnel, the HU mailings appeared to stop for approximately 4-5 days following HU's departure from the United States. However, beginning on or around November 27, 2019, USPS and USPIS personnel began to observe large volumes of parcels containing counterfeit postage being delivered at the Los Angeles Processing and Distribution Center ("LA P&DC").

28.   Throughout 2020, USPIS continued to investigate variations of the counterfeit postage scheme.  On multiple occasions, USPIS Investigators observed large volumes of mail items bearing counterfeit postage being delivered to the LA P&DC.  Investigating personnel were generally able to determine that the subject postage was counterfeit by identifying inconsistencies between the intelligent barcode data and human-readable information on the mailed items.  Investigating personnel determined that the shippers of the counterfeit postage were frequently transplanting intelligent barcode data from previously mailed items onto new shipping labels in order to fabricate counterfeit postage.

29.   Based on my training and experience and my conversations with USPS personnel, I know that USPS personnel at the LA P&DC would reject deliveries of mail items containing counterfeit postage if they became aware that the subject postage was counterfeit.  When this occurred, USPS staff would either refuse to take custody of the subject mail items or would contact the company that delivered the subject items and instruct them to retrieve the delivery.  However, due to the high volume of packages being submitted through the LA P&DC every day, I believe only a small portion of the items bearing counterfeit postage were reviewed and, accordingly, ultimately identified and rejected.

30.   On or around June 29, 2020, USPIS personnel visited a warehouse they had identified as introducing mail bearing counterfeit postage.  The warehouse owner, Witness 1, said he

14

had been contacted by CHEN, who asked him to ship the parcels
that were subsequently identified as bearing the counterfeit
postage.  He provided phone number 909-636-7150, which matches
the phone number associated with CHEN in a law enforcement
database.

31.  Witness 1 agreed to place a call to CHEN that was
monitored and recorded by PI Shen.  The conversation was
conducted in Mandarin and was later translated into English.
During the call, CHEN told Witness 1 that the police had been to
her place before and instructed Witness 1 to tell the
authorities that he doesn't know anything.

D. **INVESTIGATION OF CHEN**

Companies registered to CHEN are issued Voluntary
Discontinuances

32.  To combat the use of counterfeit postage labels on
USPS mailings, the USPS issues a "Voluntary Discontinuance –
Counterfeit Postage Labels" ("VD") form, which is issued to
individuals who have been found to be introducing or attempting
to introduce US mail bearing counterfeit postage into the mail
stream.

33.  The VD informs the recipient that he/she is being
contacted by USPIS regarding mailings containing invalid
postage.  Additionally, it states that the continued use of
invalid postage would expose the recipient and/or the company
he/she works for to potential criminal and civil liability.  The
form includes a signature line for the recipient who, by

15

signing, acknowledges that he/she has been informed of the above-stated facts and has voluntarily agreed to stop using invalid postage labels and to use only legitimate postage labels on all future mailings.

34.  On or about October 24, 2022, I queried the California Secretary of State and California Company Directory website for business records associated with CHEN.  I identified several business entities listing CHEN as agent, including the following:

a.  Coco USA Group International Inc – (Corporate ID: 5093184) (Active); incorporated on May 25, 2022 with agent name LIJUAN CHEN at 6968 Silverado Street, Chino, CA 91710.

b.  AHC Supply Chain Management Inc – (Corporate ID: 4716064) (Active); incorporated on March 26, 2021, with agent name LIJUAN CHEN at 317 East Foothill Boulevard, STE #208, Arcadia, CA 91006.

c.  Art Plus Enterprise Inc – (Corporate ID:3433325) (Suspended); incorporated on January 6, 2012, with agent name LIJUAN CHEN at 117 West Garvey Avenue, #207, Monterey Park, CA 91754.

35.  On the same date I located records with similar business names which appear to be related to those above, and include CHEN's father-in-law, Zongshou Hu, as the agent name:

a.  Art Plus Technology Inc - (Corporate ID:3629790) (Suspended); incorporated on December 27, 2013 with agent name Zongshou Hu listed as President as of the most recent filing, located at 17355 Railroad Street, City of Industry, CA 91748.

16

b.   AHC International Group Inc - (Corporate ID:4020587) (Active); incorporated on May 1, 2017 with agent name Zongshou Hu listed as Chief Executive Officer and Director and his son HU listed as Secretary/Chief Financial Officer and Director as of the most recent filing, located at 17355 Railroad Street, City of Industry, CA 91748. HU is the listed name on the electronic signature for the Statement of Information update filed on July 22, 2022.

c.   Coco USA Group Inc - (Corporate ID:4029085) (Active); incorporated on May 30, 2017 with agent name Zongshou Hu listed as Chief Executive Officer and Director as of the most recent filing, located at 1249 South Diamond Bar, #211, Diamond Bar, CA 91765.  HU is the listed name on the electronic signature for the Statement of Information update on October 18, 2022.

36.  In reviewing USPIS records, I found the following VD's were issued to individuals associated with CHEN's companies, who attempted to introduce mail bearing counterfeit postage labels into the mail stream. The company names and addresses were provided by the drivers of the delivery vehicles:

a.   Art Plus Technology – 17355 Railroad Street, City of Industry, CA 91748; VD issued on November 19, 2019, to recipient HU.

b.   Coco USA Group, 5353 West Imperial Highway, Los Angeles, CA 90045; VD issued on April 29, 2021 to Omar Flores ("Flores") driving a truck bearing CA license plate 92540M1.

17

c.    AHC Supply, 16285 Gale Avenue, City of Industry (i.e., the SUBJECT PREMISES); issued on April 30, 2022, to Manuel Lopez ("Lopez"), driving truck bearing Indiana license plate 2849367 ("the Indiana Truck").

d.    Coco USA – 5353 Imperial Highway, unit #900, Los Angeles, 90045 to recipient Flores on May 18, 2022 (no vehicle information recorded).

Postal Employee Receives Email Regarding CHEN

37.    In August of 2022, I received an email forwarded from USPS employee J.N.  J.N. had a conversation with a customer via email who was considering doing business with CHEN.[4]  The customer sent the following message to J.N., entitled "bad label Address", which was translated from Chinese by J.N. and forwarded to me.  J.N. wrote the following to me in an email:

a.    "The customer sent me the message, the translated [sic] as follows:"

1. "Delivery address and recipient information:  Angela, Tel: 9096367150, address: 16285 GALE AVE INDUSTRY CA 91745" [the SUBJECT PREMISES]

2. "You need to call in advance to confirm whether the Angela warehouse can receive the parcels. Make an appointment for the drop time, the parcels where [sic]

_____

[4] Based on my investigation, I believe the majority of the parcels delivered to the SUBJECT PREMISES for processing and shipping originate in China.  Based on a review of bank records for accounts under the control of HU and CHEN, performed by IRS:CI SA Li, I know that these account have received substantial amounts from business entities believed to be located in Hong Kong and China.

18

transfer in 24 hours. If it's Sunday, it will be
postponed by one day."

Surveillance of CHEN residence and SUBJECT PREMISES

38.   On October 25, 2022, several Postal Inspectors and I
conducted surveillance of the SUBJECT PREMISES and 1357
Bellavista Drive, Walnut, CA ("CHEN's residence"), which had
previously been identified as CHEN's residence based on
surveillance and public records searches.

a.   During the surveillance we observed a white,
four-door Tesla with California plate number 9AXR837 ("CHEN's
Tesla") leave CHEN's residence and go to the SUBJECT PREMISES.
A search of California vehicle registration records reveals that
CHEN's Tesla is registered to "AHC Supply Chain Management Inc.,
or Lijuan Chen."  At the SUBJECT PREMISES, CHEN's Tesla parked
in the rear of the warehouse complex near the office door
entrance of the SUBJECT PREMISES.  Surveilling inspectors
identified the driver as CHEN based on her California driver's
license photo.  CHEN made numerous cell phone calls and appeared
to be texting and/or using her cell phone when not actively
talking on the phone.

b.   CHEN left the SUBJECT PREMISES without getting
out of CHEN's Tesla and drove back to the CHEN residence.

39.   On October 26, 2022, Postal Inspectors Brook Robinson
("PI Robinson") and Jolisia Bennett ("PI Bennett") conducted
surveillance of the CHEN residence and observed a truck bearing
CA license plate 98781G3 parked on the street in front of the
residence.  Based on information provided by USPS employees, I

19

know that the same truck was turned away the day before at the
LA P&DC for trying to ship mail with counterfeit postage.  PI's
Robinson and Bennett subsequently observed CHEN's Tesla
travelling from the CHEN residence to the SUBJECT PREMISES.

40.  Upon arriving at the SUBJECT PREMISES, PIs Robinson
and Bennett observed that the truck bearing CA license plate
98781G3 was also present at the SUBJECT PREMISES.  At
approximately 12:07 p.m., the truck and CHEN's Tesla left the
SUBJECT PREMISES and were followed to 15025 Proctor, City of
Industry, CA 91746.  The truck and CHEN's Tesla both entered the
parking lot at approximately 12:15 p.m.  An unidentified man
opened the front passenger door and got into CHEN's Tesla, which
was then seen returning to the SUBJECT PREMISES.

41.  On October 27, 2022, Inspectors conducted surveillance
of the SUBJECT PREMISES and observed CHEN's Tesla enter the
parking lot of the SUBJECT PREMISES and park in front of the
neighboring business.  Postal Inspector Alvin Dvorak saw CHEN
walk across the dock and enter the SUBJECT PREMISES.  Shortly
thereafter he observed CHEN's Tesla drive out of the area.  He
later observed CHEN's Tesla return and park at the rear entrance
of the SUBJECT PREMISES, and observed CHEN get out of the car
and go into the SUBJECT PREMISES.  A short time later he saw
CHEN leave the SUBJECT PREMISES and drive back around to the
front of the complex from which she left the area.

Confidential Sources Provide Information on CHEN

42.  Postal Inspector Diana Cavanagh and IRS:CI Special
Agent Johnson Li ("SA LI"), have met with confidential

20

informants (CI-1 and CI-2) who voluntarily provided information pertaining to CHEN.  In reviewing reports and discussions with the interviewing agents, I learned CI-1 and CI-2 provided the following information:

        a.   CI-1 and CI-2 both claimed to have previously worked at the SUBJECT PREMISES and be personally familiar with its operations.  Both CI-1 and CI-2 identified CHEN as the individual in charge of the operations at the SUBJECT PREMISES.

        b.   Warehouse workers at the SUBJECT PREMISES each had a station.  When new parcels of mail were received at the warehouse, employees would scan a barcode on each piece of mail and the machines at their stations would print postage to affix to each package.  The packages with the postage would then be loaded onto trucks and driven to distribution centers for mailing.  Mail shipments were sometimes turned away by USPS employees.  When this occurred, the mail shipments would be returned to the SUBJECT PREMISES and would be re-labelled and broken down into smaller shipments.  CHEN and her workers would then, once again, attempt to mail the parcels.

    43.  Based on information obtained over the course of this investigation from government databases, and information provided to IRS:CI SA Li by CI-1 and CI-2, and government surveillance conducted on May 21, 2023, I understand that CHEN travelled to China in December 2022, and only recently returned to the United States on May 21, 2023.  CI-1 and CI-2 have informed IRS:CI SA Li that they believe CHEN continued to

operate and manage the SUBJECT PREMISES during her time in China with the assistance of local employees.

## E. SPECIFIC EVIDENCE OF USE OF FALSE POSTAGE

44.   On April 25, 2023, at approximately 7:00 a.m., I responded to the LA P&DC to conduct a mail review.

a.   At approximately 10:45 a.m., USPS Revenue Fraud Analysts John Truong ("RFA Truong") and Linda Dalton ("RFA Dalton") observed a truck bearing CA plate 58595R3 unloading mail in the docking area.  I interviewed the driver Jonathan Najera ("Najera") who advised he was the driver for a company called Franco and had picked up the mail from City of Industry (Najera did not disclose the exact location) earlier in the morning.  I asked Najera who was the supervisor of the company he picked up from in City of Industry and he stated "Angela."

b.   I obtained the delivery order document which listed Franco Trucking located at 21038 S. Wilmington Avenue, Carson, CA 90810 on the top left.  According to the order, 12,000 "First Class Small Parcels" were scheduled to be delivered to the LA P&DC.

c.   Investigators subsequently reviewed the packages offloaded at the LA P&DC by Najera and identified twelve large double stacked carboard boxes which each contained approximately 1,000 individually addressed parcels.  Based on a sampling of the parcels in each box, investigators determined that the majority of the subject parcels bore counterfeit postage. Specifically, investigators noticed that the meter numbers on

many of the shipping labels, all of which indicated that they
had been purchased and printed in 2023, related to postage
meters known to have been discontinued in 2020.  For other mail
items, investigators noticed that the information contained in
the human-readable portion of the tracking barcode was
frequently inconsistent with other items of information on the
postage.  For example, multiple packages bore tracking numbers
identifying Pitney Bowes as the source of postage, but
intelligent barcode data identifying EasyPost as the source of
the postage.

        d.    Subsequently, on April 25, 2023, Investigators
observed a second mail delivery by Najera in a truck bearing CA
plate 58596R3.  Najera informed RFA Truong that the mail parcels
had been picked up from a facility at City of Industry but did
not provide any more information.  I subsequently obtained the
delivery order document for this delivery, which listed Franco
Trucking located at 21038 S. Wilmington Avenue, Carson, CA 90810
on the top left.  According to the order, 12,000 "First Class
Small Parcels" were scheduled to be delivered to the P&DC.

        e.    Investigators subsequently reviewed the packages
offloaded at the LA P&DC by Najera in his second delivery, and
identified twelve large double stacked carboard boxes which each
contained approximately 1,000 individually addressed parcels.
Based on a sampling of the parcels in each box, investigators
determined that at least the majority of the subject parcels
bore counterfeit postage.  Investigators noted that the parcels

bore indicia of fraud similar to those observed in the earlier mail delivery made by Najera.

45.   On April 26, 2023, at approximately 7:00 a.m., I conducted surveillance at the SUBJECT PREMISES.  Upon arrival, I observed a truck bearing CA plate 58596R3 parked adjacent to the loading dock area, and a truck bearing CA plate 58595R3 parked against the wall.

a.   At 1:25 p.m., RFA Truong observed the truck bearing CA plate 58595R3 pull into a loading dock at the LA P&DC and drop ten large double stacked carboard boxes and two single stack carboard boxes.  I have reviewed the contents of these boxes.  Based on a sampling of the parcels in each box, I determined that each box contained multiple items of mail bearing indicia of counterfeit postage, including invalid meter numbers and/or inconsistent human-readable and intelligent barcode data.

46.   On May 16, 2023, I conducted surveillance at the SUBJECT PREMISES.  Upon arrival, I observed a truck bearing CA plate 58595R3 parked adjacent to the loading dock area, and a truck bearing CA plate 58596R3 parked on the rear side of the complex close to the backside loading area.

a.   At approximately 8:53 a.m., I saw truck 58596R3 back into the front-loading dock area.  At approximately 9:22 a.m., I watched truck 58596R3 leave the area.  I surveilled 58596R3 to the LA P&DC where it pulled into the Bulk Mail Entry Unit area, and then proceeded to a loading dock.

24

   b. Once inside the LA P&DC, I observed the driver of 58596R3, Najera, unload twelve large carboard boxes full of mail. Najera informed me that he was picking up mail from City of Industry and that he works for a company called Durango Transportation. Najera then stated he was coming from Carson not City of Industry. I obtained the delivery order document, which listed Durango Transportation located at 21038 S. Wilmington Avenue, Carson, CA 90810 on the top left.

   c. Upon reviewing the packages delivered to the LA P&DC by Najera, I observed twelve large double stacked carboard boxes, each containing approximately 1,000 individually addressed mail parcels. I have reviewed the contents of these boxes. Based on a sampling of parcels taken from each box, I observed that each box contained multiple parcels bearing counterfeit postage. Specifically, investigators noticed that the meter numbers on many of the shipping labels, all of which indicated that they had been purchased and printed in 2023, related to postage meters known to have been discontinued in 2020. For other mail items, investigators noticed that the information contained in the human-readable portion of the tracking barcode was frequently inconsistent with other items of information on the postage. A redacted photograph of one of the parcels bearing counterfeit postage is shown below.



47.   Based on my training and experience, and my
conversations with RFA Truong, I know that the meter number,
beginning with the digits "07," on the postage on the parcel
shown above (identified by the red arrow) corresponds to a
postage meter that was previously issued to the postage services
provider Endicia, but was discontinued in 2020.  Accordingly,
the postage shown above could not have been issued by Endicia in
2023 and is therefore invalid and counterfeit.

48.   Based on the abovementioned information, I believe
there is probable cause to find that on or around May 16, 2023,
CHEN knowingly caused multiple pieces of counterfeit postage to
be possessed and used at the LA P&DC within Los Angeles County
in the Central District of California, in violation of 18 U.S.C.

§§ 501 and 2(b).  Similarly, I believe there is probable cause to find that, beginning as early as August 2022 and continuing through at least May 16, 2023, CHEN conspired with others to defraud the United States by obstructing the lawful functions of the USPS by deceitful and dishonest means, specifically counterfeit postage used to evade and impede the revenue collection functions of the USPS, in violation of 18 U.S.C. § 371.

49.  RFA Truong has reviewed the counterfeit postage items identified by USPIS and USPS during the operation conducted on May 15, 2023.  Based on his review of mail items determined to contain counterfeit postage, RFA Truong identified multiple indicia of fraud (e.g., discontinued Endicia postage meters) and reviewed USPS databases to identify all mail parcels processed through Los Angeles mail processing and distribution facilities bearing similar characteristics and thus believed to be connected to CHEN's operations.  Based on his analysis, RFA Truong estimates that, between November 1, 2022, and April 30, 2023, CHEN and her employees have shipped over 9,000,000 mail parcels containing counterfeit postage, resulting in estimated revenue losses to the USPS of over $60,000,000.

## F. TRAINING AND EXPERIENCE REGARDING FRAUD OFFENSES

50.  Based on my training and experience and information obtained from other law enforcement officers who investigate various fraud offenses I know the following:

a.   It is common practice for individuals involved in financial frauds to possess and use multiple digital devices at once.  Such digital devices are often used to facilitate, conduct, and track fraudulent transactions.  Individuals who participate in financial fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

b.   Individuals involved in these crimes will often funnel the proceeds from these crimes through or to the bank accounts of others involved in the conspiracy.

## G.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[5]

51.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[5] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

29

who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

    52.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

        a.    Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

        b.    Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

53.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus the warrants I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress CHEN'S thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of CHEN'S face with her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

d.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

///

32

## V.   <u>CONCLUSION</u>

54.   For all of the reasons described above, there is probable cause to believe that CHEN violated 18 U.S.C. § 371 (Conspiracy to Defraud the United States) and 18 U.S.C. § 501 (Use or Possession of Counterfeit Postage).  Further there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violation of the Subject Offenses will be found in the SUBJECT PREMISES and on the person of CHEN, as described in attachments A-1 and A-2.


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __22d__ day of May, 2023.

*Patricia Donahue*

_____
HON. PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE